## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

Ann Hilt,

                              Plaintiff,

                                          Civ. No. 10-987 (RHK/TNL)
                                          **MEMORANDUM OPINION**
v.                                        **AND ORDER**

St. Jude Medical S.C., Inc.,

                              Defendant.

Michael L. Puklich, Neaton & Puklich, P.L.L.P., Chanhassen, Minnesota, for Plaintiff.

Laura J. McKnight, Laurel J. Pugh, Bassford Remele, PA, Minneapolis, Minnesota, for Defendant.

## INTRODUCTION

Plaintiff Ann Hilt worked as a Corporate Accounts Director for Defendant St. Jude Medical S.C., Inc. ("St. Jude"). She commenced this action after her employment was terminated, asserting that St. Jude retaliated against her in violation of the Minnesota Whistleblower Act, Minn. Stat. § 181.932, because she voiced concerns about its sales practices and participated in a government investigation.[1] St. Jude now moves for partial summary judgment.[2] For the reasons set forth below, the Court will grant its Motion.

---

[1] Hilt also originally asserted claims for gender discrimination and negligence. She has since agreed to voluntarily dismiss those claims (Mem. in Opp'n at 36), as confirmed by her counsel at the June 29, 2010, hearing on this Motion.

[2] Count IV of Hilt's Complaint asserts an additional claim for failure to pay wages owed in violation of Minn. Stat. § 181.13. This Motion does not extend to that claim, so it will remain.

## BACKGROUND

### I.    Hilt's Employment at St. Jude

Hilt began working for St. Jude in April 2003 as a Corporate Accounts Director for its Central Mid-West Region based in Chicago.  In this position, she oversaw development of sales strategies, sales practices, and pricing within that Region.  She did not have direct sales responsibilities, and it was not part of her job to investigate legal compliance issues.  (Hilt Aff. ¶¶ 2, 14.)

Hilt held this job for six years and reported to a variety of supervisors over that period.  Her performance was generally satisfactory.  She was given a 3 out of 5 (signifying "meets expectations") on her annual performance appraisals by two different supervisors in 2006 and 2008.[3]  (See McKnight Decl. Ex. 4.)  Her 2006 appraisal noted some areas for improvement, including communication skills, in which she was given a 2 (meaning "below expectations"); however, that rating had increased to "meets expectations" on her 2008 appraisal.   (Id.)  There is no record that Hilt was ever disciplined or formally reprimanded for any performance problems.

David Hendrick began working for St. Jude around the same time as Hilt.  At all relevant times, he was the company's Vice President of Corporate Accounts.  In January 2009, Hendrick "hand-selected" Hilt for a promotion to Director of National Accounts.[4] (Hendrick Dep. at 37-38.)  This newly created position remained within the Corporate

---

[3] These are the only two performance appraisals in the record.  Hilt was not reviewed in 2009 because her employment was terminated before the year had ended.  (See Hendrick Aff. ¶ 9.)

[4] Both parties characterize this job change as a promotion from Hilt's previous position.

Accounts Group, but Hilt became responsible for overseeing St. Jude's contracting and sales strategies with respect to its national accounts, which included some of its largest customers. Thus, although many of Hilt's duties remained similar, her promotion placed her in charge of overseeing accounts representing over one billion dollars of St. Jude's business. (Hilt Aff. ¶ 4.) Additionally, Hilt's old position was not filled immediately, so she continued performing some of her previous job duties. She worked as a Director of National Accounts for only eight months before her employment was terminated in August 2009. She reported directly to Hendrick the entire time.

Hilt and Hendrick offer differing accounts of her performance as Director of National Accounts. According to Hilt, Hendrick said her performance was "very good"—she "was never given any type of 'warning' that [she] was not performing well" and she "never received any employment coaching or other action that led [her] to believe that [her] performance was anything but above average." (Hilt Aff. ¶ 4.) Conversely, Hendrick identifies various shortcomings in her performance and a general "pattern" of behavior her co-workers brought to his attention, described as: "Lack of effort from [Hilt]. Lack of consistent communication. Lack of follow-up." (McKnight Decl. Ex. 1 (Hendrick Dep.) at 29-31.) Hilt claims, however, that Hendrick "never communicated these issues" of consistency or timeliness to her. (Hilt Aff. ¶ 5.)

Hendrick specifically points to one incident where Hilt's work on a submission for a customer was "terribly unprofessional." (Hendrick Dep. at 26.) He claims to have given Hilt a "specific warning" to avoid such conduct in the future, but he does not recall documenting this warning and he did not pursue any formal discipline through human

3

resources.  (Id. at 26-27.)  Hilt recalls this same situation, but characterizes Hendrick's

response differently, saying: "Mr. Hendrick simply advised me of a change he wanted to

see for answering requests for information.  He never told me that I was unprofessional,

violated any policy and/or inappropriately answered the request.  I never received a

warning."  (Hilt Aff. ¶ 5.)

Notwithstanding the foregoing concerns about Hilt's performance, Hendrick

nevertheless acknowledged that he "generally considered her to be a competent

employee."  (Hendrick Aff. ¶ 8.)  His concerns were minor, and he never saw the need to

document them or to pursue formal discipline, nor did he ever intend to terminate her

employment due to poor performance.  (Id.)  In late July 2009, however, Hendrick was

advised that St. Jude was implementing a reduction in force ("RIF") of ten percent, and

he was given the responsibility to identify three individuals from the 33-person Corporate

Accounts Group for inclusion in this RIF.

In making this decision, Hendrick went through a process of evaluating,

comparing, and ranking the employees within his group.  He considered a number of

factors, including the employees' scores on their 2008 performance appraisals, rankings

by two senior directors who reported to him and who oversaw some of the Corporate

Accounts employees (neither of whom supervised Hilt), and his own observations of the

employees' performance and successful outcomes they had achieved.  (See Hendrick

Dep. at 14-20.)  A "3" was the lowest score given to any Corporate Accounts employee

who had undergone a 2008 performance appraisal, and Hilt was among the seven

employees in the group receiving a "3" rating.  (McKnight Decl. Ex. 6.)  Hendrick

testified that he received generally "not positive" feedback about Hilt's performance from two senior directors (who worked with Hilt, but did not supervise her).  (Hendrick Dep. at 15-16.)  He also compared her performance to that of Ron Carlucci, the other Director of National Accounts, who was the only other member of the group whose position Hendrick considered "comparable" to Hilt's.  (Id. at 23.)  Hedrick found Hilt's performance only "average" based on his expectations, while Carlucci performed "above average."  (Id. at 19.)  He felt that Carlucci was "far more collaborative.  He was a better strategist.  Worked better with teams of individuals.  Communicated better.  [And] [u]ltimately, developed better strategies."  (Id. at 20.)

After considering all of this information, Hendrick ranked Hilt in the bottom five of his 33 employees, although she was the highest of those five.  (See McKnight Decl. Ex. 7.)  He ultimately selected the bottom two employees and Hilt for inclusion in the RIF based upon "performance and expectations for continued contributions of growth and contributions to St. Jude Medical."  (Hendrick Dep. at 36.)  Even though two of the "bottom five" employees were ranked lower than Hilt, Hendrick concluded that those two individuals "were both very new and [he] believe[d] that they were going to contribute going forward at a much higher level than [Hilt] was."  (Hendrick Dep. at 80-81.)  He acknowledges that it was "a very difficult decision."  (Id. at 36.)

## II.    Hilt's "Whistleblowing" Activities

Hilt avers that during the course of her employment with St. Jude, she made multiple "reports of what [she], in good faith, believed to be violations of the law."  (Hilt Aff. ¶ 10.)  These reports concerned alleged violations of anti-kickback laws with respect

to situations at Christ Hospital in Chicago, Silver Cross Hospital, The University of Chicago, St. Catherine Hospital, St. James Olympia Fields Hospital, and Rockford Memorial Hospital.  (Id.)  In each instance, during the course of reviewing an account in connection with preparing sales strategies, Hilt became aware that equipment, software, or the like was being left in a hospital when it should not have been.  (Id. ¶ 13.)  Her recollection of the facts surrounding these reports varies in specificity and she does not provide any precise dates, yet she repeatedly asserts that she made such reports and did so "for the purpose of letting St. Jude know that [it was] violating the law and to get [it] to correct the issue."  (Id. ¶ 10.)  Hilt worked solely "through [her] management" to report her concerns; she never called the hotline at St. Jude that was available for reporting conduct believed to be unethical or illegal, even though she knew such a hotline existed. (McKnight Decl. Ex. 2 (Hilt Dep.) at 58.)

With respect to the Christ Hospital report, Hilt testified that she discovered a piece of equipment (called Epicor) had been left in the hospital without charge for more than a year beyond its 90-day trial period.  (Hilt Dep. at 51, 60; Hilt Aff. ¶ 12.)  She contacted Hendrick via e-mail and notified him that the Epicor had been left in place beyond its trial period and she "did not think we should be doing this."  (Hilt Dep. at 51.)  This occurred before Hilt became Director of National Accounts in January 2009.  (Id. at 60-61.)  Later, after her promotion, Hilt discovered that the issue at Christ Hospital continued to exist, so she again spoke to Hendrick and "told him that the equipment was still at the hospital and leaving it there was illegal."  (Hilt Aff. ¶ 12.)  Hilt does not identify when this follow-up report occurred.

6

Hilt recounts similar situations involving Silver Cross Hospital in Joliet and the University of Chicago, both of which also occurred prior to her promotion.[5]  (Hilt Dep. at 50, 52.)  She learned that Silver Cross had received an upgraded system known as the Fusion, and she reported this to Hendrick; he then sent an e-mail to sales management saying they had "45 days to basically have them buy enough product to pay for the upgrade."[6]  (Id. at 53.)  When more than 45 days had passed, Hilt again alerted Hendrick to the situation.  (Id.)  With respect to the University of Chicago, Hilt became aware that an area vice-president, Scot McDonell, and another individual had promised one of the physicians that they would get him the Fusion although the hospital had not properly earned it.  (Id. at 45-46.)  Hilt informed Hendrick and worked with him "to basically clean up the situation for St. Jude in making it where they did finally earn it versus just getting it."[7]  (Id. at 46.)  She also told McDonell about the situation at Silver Cross, saying to him, "do you realize that this is in violation of the law and stuff?"  (Hilt Dep. at 54.)  Additionally, she testified that she may have told others at St. Jude about her concerns regarding Silver Cross and University of Chicago, including her then supervisor, Rupa Basu.  (Id. at 54-56.)

---

[5] In some places throughout Hilt's discussion of Silver Cross and the University of Chicago, the deposition transcript refers to "UFC."  Those letters do not correspond to any entity mentioned in the record.  At oral argument, counsel clarified that "UFC" should instead read "U of C," referring to the University of Chicago.

[6] St. Jude had an "earn-in" program, which allowed customers to earn software or upgrades (like the Fusion) as incentives if they purchased certain amounts of other products.  (Hilt Dep. at 46.)

[7] At the time she reported the University of Chicago incident, Hilt was supervised by Rupa Basu, and she testified that Basu wrote to Hendrick about the situation and informed him she was "going to pay [Hilt] the bonus" as a result of her work on it, to which he apparently replied "absolutely."  (Hilt Dep. at 47.)

Hilt expressed similar concerns to Hendrick regarding Epicor equipment at St. Catherine's Hospital in Hobart, Indiana. (Hilt Dep. at 129-30.) A St. Jude representative moved the equipment between St. Catherine's and Saint James Olympia hospital, and Hilt believed this violated anti-kickback laws. (Id.; Hilt Aff. ¶ 13.) Hilt testified that she advised Hendrick of this situation as well, saying something like, "that's illegal, isn't it?" or "you can't do that, can you Dave?" (Id. at 130-31.) She does not recall the exact words she used, but she remembers communicating to Hendrick that the situation was wrong. (Id.) She also claims she made a report concerning Rockford Memorial Hospital, but she provides no details about this report. (Hilt Aff. ¶ 10; see generally, Hilt Dep.)

In addition to the various reports set forth above, Hilt also cooperated in a federal government investigation into St. Jude. Shortly after becoming Director of National Accounts, she received an e-mail from Gina Cavalier, an attorney representing St. Jude, requesting information about certain contract models and practices. (Hilt Dep. at 61-62.) Everyone in the Corporate Accounts Group received this e-mail, including Hendrick (id. at 61; Hendrick Decl. ¶ 3); thus, Hendrick knew Hilt had received the request. (Hilt Dep. at 62-63; Hilt Decl. ¶¶ 4-5.) Because Hilt was aware of a situation involving one of the contracting practices identified in the e-mail, she replied to it and checked the box identifying that practice "yes." (Hilt Dep. at 61.) This practice, which involved rebates, was related to a program Hilt had worked on for the Resurrection Health System account; the purported violation occurred in 2005. (Id. at 63-65.) Hilt had not reported the

practice to anyone because she did not realize it violated any law or regulation prior to receiving Cavalier's e-mail.  (Id. at 65.)[8]

After Hilt's first response to Cavalier's e-mail, she was questioned further and continued to cooperate in the investigation—she answered questions, reviewed invoices, gathered documents, and did research, all as a result of the government's requests.  (Hilt Aff. ¶ 11.)  Hilt testified that Hendrick knew she was working with St. Jude's lawyers on this investigation.  (Hilt Dep. at 63-64.)  Specifically, she claims she informed Hendrick of her involvement in mid-July of 2009.  (Hilt Aff. ¶ 11.)  Hendrick disagrees, however, claiming he was aware that Hilt had answered questions in the e-mail, but he was not aware that she had any further involvement in the investigation.  (Hendrick Decl. ¶ 5.)

After her employment was terminated, Hilt commenced the instant action.  She alleges that Hendrick selected her for the RIF because she had reported wrongdoing on various occasions and participated in the government's Resurrection Health System investigation, in violation of the Minnesota Whistleblower Act.  St. Jude denies these allegations and now moves for summary judgment on Hilt's whistleblower claims.  The Court heard oral arguments on June 29, 2011, and the Motion is ripe for decision.

**STANDARD OF REVIEW**

Summary judgment is proper if, drawing all reasonable inferences in favor of the nonmoving party, there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a); Celotex Corp. v. Catrett,

---

[8] St. Jude apparently reached some type of settlement with the government regarding the Resurrection Health System situation.  (See Hendrick Dep. at 52.)

477 U.S. 317, 322-23 (1986).  The moving party bears the burden of showing that the material facts in the case are undisputed.  Id. at 322; Whisenhunt v. Sw. Bell Tel., 573 F.3d 565, 568 (8th Cir. 2009).  The Court must view the evidence, and the inferences that may be reasonably drawn from it, in the light most favorable to the nonmoving party.  Weitz Co., LLC v. Lloyd's of London, 574 F.3d 885, 892 (8th Cir. 2009); Carraher v. Target Corp., 503 F.3d 714, 716 (8th Cir. 2007).  The nonmoving party may not rest on mere allegations or denials, but must show through the presentation of admissible evidence that specific facts exist creating a genuine issue of material fact for trial.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256 (1986); Wingate v. Gage Cnty. Sch. Dist., No. 34, 528 F.3d 1074, 1078-79 (8th Cir. 2008).  Further, as the Eighth Circuit has recently clarified, summary judgment is equally appropriate in a discrimination case as in any other case in which there exists no genuine issue of material fact.  Torgerson v. City of Rochester, __ F.3d __, 2011 WL 2135636, at *8 (8th Cir. 2011) (*en banc*) ("There is no 'discrimination case exception' to the application of summary judgment.").[9]

## ANALYSIS

Hilt asserts that she engaged in protected conduct under the Minnesota Whistleblower Act by (a) making a good-faith report of a suspected violation of law, and (b) participating in a government investigation.  The portions of the Act on which she relies provide as follows:

---

[9] As a result of Torgerson, numerous prior employment cases from the Eighth Circuit have been abrogated in part on this point of law and are thus designated with a "red flag" by Westlaw. When the Court cites such cases for other points of law that remain good law, however, it will not pause to indicate their abrogation on other grounds.

> An employer shall not discharge, discipline, threaten, otherwise discriminate against, or penalize an employee regarding the employee's compensation, terms, conditions, location, or privileges of employment because:
>
> > (1) the employee, or a person acting on behalf of an employee, in good faith, reports a violation or suspected violation of any federal or state law or rule adopted pursuant to law to an employer or to any governmental body or law enforcement official; [or]
> >
> > (2) the employee is requested by a public body or office to participate in an investigation, hearing, inquiry.

Minn. Stat. § 181.932, subd. 1(2).  Claims under the Minnesota Whistleblower Act are analyzed using the familiar McDonnell Douglas burden-shifting framework.  E.g., Pope v. ESA Servs., Inc., 406 F.3d 1001, 1010 (8th Cir. 2005); Cokley v. City of Ostego, 623 N.W.2d 625, 630 (Minn. Ct. App. 2001).  Accordingly, Hilt has the initial burden of establishing a *prima facie* case of retaliation.  If she can, the burden then shifts to St. Jude to articulate a non-retaliatory reason for the adverse employment action, after which the burden shifts back to Hilt to show that the proffered reason was a pretext for retaliation. E.g., Skare v. Extendicare Health Servs., Inc., 431 F. Supp. 2d 969, 974 (D. Minn. 2006) (Kyle, J.), aff'd 515 F.3d 836 (8th Cir. 2008) (applying burden-shifting framework to whistleblower claim).  "At all times, [Hilt] has the burden to prove by a preponderance of the evidence that [St. Jude's] action was for an impermissible reason."  Id. (citing Cokley, 623 N.W.2d at 630)).

The elements of a *prima facie* case under the Minnesota Whistleblower Act are: "(1) statutorily protected conduct by the employee; (2) an adverse employment action by the employer; and (3) a causal connection between the two."  Cokley, 623 N.W.2d at 630

(quoting Hubbard v. United Press Int'l, Inc., 330 N.W.2d 428, 444 (Minn. 1983)).  There is no dispute here that Hilt suffered an adverse employment action when she was selected to be part of St. Jude's RIF.  St. Jude does argue, however, that Hilt has failed to present a genuine issue of material fact as to whether she engaged in statutorily protected conduct or that there was a causal connection between any such conduct and her termination.

Yet, when an employer has proffered the legitimate, non-retaliatory reason required at step two of McDonnell Douglas, the Court may skip the *prima facie* case and move directly to the question of discrimination *vel non*.  E.g., U.S. Postal Serv. Bd. of Governors v. Aikens, 460 U.S. 711, 715 (1983); Riser v. Target Corp., 458 F.3d 817, 820-21 (8th Cir. 2006).  St. Jude has given a legitimate, non-retaliatory reason for terminating Hilt's employment as part of its RIF: she was among the lowest-ranked employees in her group.  Hence, the Court may move directly to the last step of the McDonnell Douglas analysis.[10]  E.g., Buytendorp v. Extendicare Health Servs., Inc., 498 F.3d 826, 835 (8th Cir. 2007).  At the final step of the McDonnell Douglas analysis, the plaintiff is "obliged to present evidence that (1) creates a question of fact as to whether

---

[10] The Court is not satisfied that Hilt has presented sufficient evidence to establish a *prima facie* case, particularly with regard to her whistleblower claim based on making reports.  Hilt's evidence in support of her claim consists solely of her testimony that she discussed various concerns with Hendrick; she never formally documented these concerns, nor did she utilize St. Jude's hotline for reporting conduct believed to be unethical or illegal.  See Skare, 431 F. Supp. 2d at 979-80 ("[I]n recounting her complaint, [plaintiff] often cannot remember the specific conversation, nor when it took place, nor what the response to her complaint was.  Accordingly, the Court determines that [she] has failed to raise a genuine issue of fact regarding whether she engaged in protected conduct under the Whistleblower Act, and her claim will be dismissed.") (citations and internal quotations omitted).  However, since the Court concludes that Hilt has presented insufficient evidence to create a genuine issue whether St. Jude's proffered reason is pretext, it need not decide this case based on the "subtleties" of what qualifies one as a whistleblower under the Act.  See Buytendorp v. Extendicare Health Servs., Inc., 498 F.3d 826, 835 (8th Cir. 2007).

[defendant's] reason was pretextual and (2) creates a reasonable inference that

[defendant] acted in retaliation." Stewart v. Indep. Sch. Dist. No. 196, 481 F.3d 1034,

1043 (8th Cir. 2007) (internal quotation marks and citations omitted).  In the Court's

view, Hilt has failed to present sufficient evidence to raise a genuine issue whether St.

Jude's proffered reason was merely pretextual or whether its actions were retaliatory.

Hilt primarily argues that the temporal proximity between her purportedly

whistleblowing activities and the RIF establish that her termination was retaliatory.  She

acknowledges, however, that many of the reports she claims are protected under the Act

were made prior to her promotion to Director of National Accounts in January 2009—

eight months before the RIF.  (See Hilt Dep. at 60 ("Q. . . . [Y]ou believe the things you

described were events that occurred before you were named director of national

accounts?  A. I believe so."); accord Mem. in Opp. at 11-13.)  Only her follow-up report

about the situation at Christ Hospital clearly occurred after her promotion.[11]  Her

involvement in the government investigation was closer in time to the RIF; she testified

that she informed Hendrick of her participation in July 2009, only one month before the

RIF and around the time he was directed to terminate the employment of three

individuals from his group, although Hendrick disputes this.  (Hendrick Aff. ¶¶ 3-5.)

Yet the precise timing of Hilt's protected conduct is immaterial.  Even if only a

month or less passed between her whistleblowing activity (or Hendrick finding out about

such activity) and the RIF, "timing alone is insufficient to show a pretextual motive

---

[11] Hilt's conversation with Hendrick about the legality of the transfer of medical equipment between St. Catherine Hospital and St. James Olympia may also have occurred after her promotion, but the timing is not clear.  (See Reply Mem. at 5 & n.4.)

rebutting a legitimate, non-discriminatory reason for an adverse employment action."
Hervey v. Cnty. of Koochiching, 527 F.3d 711, 723-24 (8th Cir. 2008) (quoting Green v.
Franklin Nat'l Bank of Minneapolis, 459 F.3d 903, 916 (8th Cir. 2006)).  Indeed, while
temporal proximity may be enough to establish the causal link required for a *prima facie*
case, the Eighth Circuit has consistently ruled that "more than a temporal connection is
required to present a genuine fact issue on retaliation." Arraleh v. Cnty. of Ramsey, 461
F.3d 967, 979 (8th Cir. 2006); accord, e.g., Hervey, 527 F.3d at 723-24.

Hilt also argues, however, that there is more than mere temporal proximity to
support a finding of retaliation.  Namely, she argues that Hendrick's explanation is false
and urges the Court to infer a retaliatory motive. See, e.g., Hoover v. Norwest Private
Mortg. Banking, 632 N.W.2d 534, 545 (Minn. 2001) (citing Reeves v. Sanderson
Plumbing Prods., Inc., 530 U.S. 133, 147 (2000)) ("In some cases, sufficient evidence [of
pretext] may consist only of the plaintiff's prima facie case plus evidence that the
employer's proffered reason for its action is untrue.")

Hilt repeatedly challenges Hendrick's testimony that she had performance issues.
She contends that she was never formally disciplined, he never spoke to her about any
performance problems, and she performed above average—indeed, Hendrick promoted
her a mere eight months before the RIF.  She also flatly denies some of Hendrick's
specific claims about her performance, such as his testimony that her voicemail was
consistently full, and she characterizes other situations very differently than he described
them, like the incident involving her responses to a customer that he called "terribly
unprofessional."  Based on this conflicting testimony and the absence of any formal

14

discipline or documented performance problems, Hilt argues that Hendrick's ranking of her as one of the lowest employees in his group was false and supports an inference of pretext.

The inconsistencies between Hilt's own account of her performance and Hendrick's testimony are undeniable.  But "[a]n employee's attempt to prove pretext requires more substantial evidence than it takes to make a prima facie case because . . . evidence of pretext and retaliation is viewed in light of the employer's justification." Buytendorp, 498 F.3d at 835-36 (quoting Logan v. Liberty Healthcare Corp., 416 F.3d 877, 881 (8th Cir. 2005)).  In this case, if the proffered reason for Hilt's termination was simply poor performance, the conflicting testimony outlined above might be cause for concern and create a genuine issue of material fact.  But St. Jude's proffered reason is not merely poor performance—in fact, Hendrick readily admits that Hilt was generally competent and he had no plans to terminate her employment but for the RIF.  Instead, its proffered reason is her comparatively worse performance than others in her group, in light of St. Jude's business decision that three employees from her group had to be terminated in the RIF.

When viewed in light of this justification, Hilt's evidence fails to raise a genuine issue of pretext or retaliatory motive.  She repeatedly challenges Hendrick's evaluation of *her* performance, but the only evidence she relies upon to contradict his *comparative* evaluation is her promotion.  Specifically, she argues: "Mr. Hendrick's statement that I was one of the bottom five people within our group is false—I would never have been only one of two people promoted to the position of Director of National Accounts had I

15

been a poor performer and during my tenure as Director of National Accounts I was a very good performer." (Hilt Aff. ¶ 4.) This does not speak to her performance after the promotion, however. Hilt presents no evidence of how her co-workers performed or how she performed better than anyone else in the eight months between her promotion and her termination to support her conclusory assertions. Conversely, Hendrick specifically testified about Hilt's comparative performance while she was Director of National Accounts, explaining that she was not as good at communicating, working with teams, or developing strategies as other employees in the group, particularly Carlucci. Hilt does not contradict these comparisons. Additionally, documents in the record—such as the chart comparing employees' 2008 performance appraisal scores and Hilt's 2006 appraisal, which was conducted by a different supervisor and notes some communication problems—are consistent with Hendrick's subjective evaluation and his ranking of Hilt.

A Court "need not ignore undisputed facts, [] nor must [it] recognize unreasonable inferences." Buytendorp, 498 F.3d at 836. In this case, the Court does not believe Hilt's evidence supports a reasonable inference of pretext. Even viewed in the light most favorable to her, her evidence fails to contradict Hendrick's *comparative* evaluation of her performance. "The trier of fact may not simply choose to disbelieve the employer's explanation in the absence of any evidence showing why it should do so." Pineda v. United Parcel Serv., Inc., 360 F.3d 483, 487 (5th Cir. 2004). Furthermore, there is no evidence connecting Hendrick's rating of Hilt to an unlawful desire to retaliate against her. See Hoover, 632 N.W.2d at 546 ("[P]laintiff must put forth sufficient evidence for the trier of fact to infer that the employer's proffered legitimate nondiscriminatory reason

16

is not only pretext but that it is pretext *for [retaliation]*." (emphasis added)).  In short,

Hilt has failed to create a genuine issue whether St. Jude's reason for terminating her

employment was pretextual.  Her whistleblower claims fail.

## CONCLUSION

Based on the foregoing, and all the files, records, and proceedings herein, **IT IS**

**ORDERED** that St. Jude's Motion for Summary Judgment (Doc. No. 12) is **GRANTED**,

and Counts I, II, and III of Hilt's Complaint (attached to Doc. No. 1) are **DISMISSED**

**WITH PREJUDICE.**


Dated: July 11, 2011                        s/Richard H. Kyle
                                            RICHARD H. KYLE
                                            United States District Judge

17